IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAVRICK WILLOCKS; MARIO HINES; GREGORY GOODEN; GARETH BILLINGS; AKIL GRAY; DARIEL PALMER, a/k/a INNOCENT PALMER; MIKAEL OMARR GILLETTE; SHANNON O'CONNOR; CHRISTINA RENEE HOGARTH; KIMBERLY CAROL-JEAN HUDSON; XANU ANN MORGAN; SHERLET ANETTA LOVE; JASON JOSEPH JAHALAL; KAZRAE GRAY; and DAHLIA ELAINE HUNTER. | **S U P E R S E D I N G<br>I N D I C T M E N T**<br><br>Case No. 4:12-cr-175<br><br>Violation:  18 U.S.C. §§ 1341, 1343, 1349, 2326, 981(a)(1)(C), 982(a)(8), 982(b)(1), 1956(h), and 2; 21 U.S.C. § 853; and 28 U.S.C. §  2461(c) |

## GENERAL ALLEGATIONS

1.     The Western Union Company (Western Union) offers consumer-to-consumer money transfer services.  Consumers in the United States can send funds from Western Union agent locations, by phone and online, and receivers can pick up available funds at Western Union agent locations.  Western Union has agent locations in the United States, Jamaica, and elsewhere;

2.     Moneygram International Inc. (Moneygram) offers consumer-to-consumer money transfer services.  Consumers in the United States can send funds from Moneygram agent locations and receivers can pick up available funds at Moneygram

1

agent locations.  Moneygram has agent locations in the United States, Jamaica, and elsewhere;

3.      Jamaica National Overseas (USA) Inc. (JamUSA) is a subsidiary of Jamaican National Building Society (Jamaican National), a Jamaican financial institution, which offers consumer-to-consumer money transfer services.  JamUSA provides international money transfer services between Jamaica and other countries including the United States;

4.      In or about September of 2011, Victim 1 (V1), an eighty-three-year-old widow who resides in Harvey, North Dakota, received a series of telephone calls at V1's residence.  The unknown caller claimed to be with American Cash Awards.  The unknown caller (UC1) claimed that V1 had a $19 million cash award waiting for her and stated that V1 only had to pay the outstanding taxes to receive the money from American Cash Awards.  UC1 told V1 that American Cash Awards was based in California and claimed that American Cash Awards was working with the FBI.  V1 later received a telephone call from a second unknown caller (UC2).  UC2 claimed he was with the FBI and that he was working with American Cash Awards.  UC2 told V1 that V1 did indeed have a $19 million award waiting for her.  Both UC1 and UC2 told V1 this was a legitimate deal.  V1 described the voices of both UC1 and UC2 as being male voices;

5.      UC1 and UC2 told V1 that she needed to send money to American Cash Awards to pay the taxes and fees owed on the cash award.  V1 was instructed to wire transfer $3,500 to an individual in Portage, Ohio.  Bank employees and bank records

2

revealed that the money was wired on or about September 14, 2011.  UC1 told V1 that
she needed to provide additional funds after the money was wired;

6.      On October 3, 2011, V1 obtained three cashier's checks made payable to
SHANNON O'CONNOR as directed by UC1.  UC1 informed V1 that the money was
needed to pay fees for the $19 million cash award.  Bank records and employees indicate
V1 used funds in her account at First International Bank and Trust in Harvey, North
Dakota.  All three checks were sent to SHANNON O'CONNOR at a Deerfield, Florida,
Post Office Box.  Two (2) checks were for $20,000 and one (1) check was for $25,000.
The checks were endorsed by SHANNON O'CONNOR and were deposited into
O'CONNOR's Wells Fargo Bank account;

7.      During telephone calls in September and early October of 2011, UC1 told
V1 that she needed to send more money to American Cash Awards.  V1 was told that she
could not tell anyone or she might lose out on the $19 million.  UC1 then directed V1 to
have a check sent to American Cash Awards.  UC1 was instructed to have a check made
payable to UC1's secretary, SHANNON O'CONNOR, and was directed to send the check
via express mail.  UC1 provided V1 with the address that V1 was to use when V1 sent
the check, which was Post Office Box 4964, Deerfield, Florida 33442.  Bank records and
employees verify that on October 11, 2011, V1 wrote a $9,500 check from her First State
Bank of Harvey account made payable to SHANNON O'CONNOR.  V1 sent the check
to the Deerfield, Florida, Post Office Box to pay fees as directed by UC1, and the check
was later endorsed by SHANNON O'CONNOR;

8.     UC1 directed V1 to provide additional funds to American Cash Awards in order to secure her winnings.  UC1 directed V1 to send a second check made payable to SHANNON O'CONNOR on behalf of American Cash Awards.  Bank records and employees verify that on October 26, 2011, V1 wrote a $25,000 check from her First State Bank of Harvey account made payable to SHANNON O'CONNOR.  V1 sent the check to the same Deerfield, Florida, Post Office Box and SHANNON O'CONNOR endorsed the check.  This check was deposited into a Citibank account under the name of SHANNON O'CONNOR;

9.     UC1 directed V1 to provide additional funds and to send another check made payable to SHANNON O'CONNOR on behalf of American Cash Awards.  Bank records and employees verify that on November 14, 2011, V1 wrote a $57,000 check from her First State Bank of Harvey account made payable to SHANNON O'CONNOR.  V1 sent the check to the Deerfield, Florida, Post Office Box and the check was later endorsed by SHANNON O'CONNOR.  This check was deposited into the Citibank account of SHANNON O'CONNOR.  In December of 2011, Citibank employees spoke to SHANNON O'CONNOR concerning money she was withdrawing from her account.  O'CONNOR had withdrawn approximately $60,000 and claimed she was in the process of purchasing property overseas and said the funds were going to her husband who was going to fix up the property;

4

10.     V1 continued to receive calls from American Cash Awards.  UC1 told V1 that she needed to provide more money in order to receive the $19 million award.  UC1 also stated that if V1 could not provide more money, V1 would not only lose the $19 million award, but also all of the money V1 had already provided.  V1 told UC1 that she did not have any more money in her account and UC1 told V1 to take a loan on a life insurance policy.  As instructed by American Cash Awards, V1 did obtain the loan on a life insurance policy and provided the proceeds from the loan to American Cash Awards.  V1 provided UC1 her VISA credit card number and pin number in an effort to get more money to American Cash Awards;

11.     UC1 told V1 that American Cash Awards had the money in an account with Bank of America in California.  UC1 gave V1 a telephone number for the bank branch of the Bank of America so V1 could confirm the deposit.  V1 called the number provided by UC1 and an unknown individual answered V1's telephone call and told V1 that the money was in fact in the bank.  Months later the telephone number UC1 provided was no longer in service;

12.     V1 has not received any cash award from American Cash Awards nor has V1 been able to reach anyone with American Cash Awards;

13.     In September of 2011, O'CONNOR began to make wire transfers using Jamaica National Overseas (USA), Inc. (JamUSA).  Employees of JamUSA noticed the large increase in the amount of money O'CONNOR was wiring using their service.  JamUSA inquired as to the source of the funds O'CONNOR was using.  O'CONNOR

5

told JamUSA that the source was her job as a nurse at Spectrum Life.  O'CONNOR was also requested to provide identification.  O'CONNOR provided JamUSA with her Florida driver's license number, which number matched the driver's license number O'CONNOR provided to Citibank.  O'CONNOR informed JamUSA that the reason for these money transfers was to make payments on property she purchased in Jamaica.  O'CONNOR claimed that GREGORY GOODEN was her husband and that wire transfers to St. Elizabeth, Jamaica, were for her husband.  However, JamUSA employees stated O'CONNOR made wire transfers to three (3) different recipients located in different areas of Jamaica;

14.     In December of 2011, JamUSA again noticed that O'CONNOR made a number of wire transfers to Jamaica.  JamUSA again asked O'CONNOR to state the source of the funds and the purposes of the transfers.  O'CONNOR told a JamUSA employee that the source of the funds she transferred in November and December of 2011 was an inheritance from her grandmother who had died in 2007.  O'CONNOR was told that she would need to provide some documentation of this before she would be permitted to use JamUSA services and O'CONNOR stated she would provide the documentation.  However, O'CONNOR failed to do so and has not attempted to wire transfer any more funds herself using JamUSA.  JamUSA reported that O'CONNOR transferred more than $130,000 to seven (7) different Jamaican destinations between February 2011 and December 15, 2011.  When asked the purpose of the wire transfers,

6

O'CONNOR told a JamUSA employee that the funds were intended to pay for repairs on property she and her husband had just purchased in Jamaica;

15.     In January of 2012, JamUSA identified three (3) males who were wiring money to the same individuals that O'CONNOR had been wiring money to in Jamaica. These individuals also used the same JamUSA locations as O'CONNOR.  The three males, MIKAEL OMARR GILLETTE, AG, and DT, began to wire transfer the money the same day that JamUSA suspended O'CONNOR from using JamUSA wire transfer services.  GILLETTE wired more than $15,000 from December 7, 2011, to January 13, 2012, and GILLETTE's wire transfer recipients were the same as O'CONNOR's. GILLETTE made two wire transfers, one on January 12, 2012, in the amount of $7,350, and a second one on January 13, 2012, in the amount of $7,500.  On January 13, 2012, DT wire transferred $7,500 to a recipient who was the same recipient of an O'CONNOR transfer.  AG also conducted a wire transfer of $4,115 on January 13, 2012.  AG and GILLETTE share the same street address.  When JamUSA queried GILLETTE as to his source of funds, GILLETTE stated that he was employed as a parking lot attendant and that the source of his funds was his job and his savings.  AG stated that his occupation was a load-out worker for a dairy and that the purpose of his wire transfers was to purchase a car and the source of funds was his salary.  DT told JamUSA that the source of his funds was his job as a merchandiser with a large soft drink company and claimed that the purpose of his wire transactions was for house repairs.  JamUSA concluded that the amounts of money AG, GILLETTE, and DT transferred during the period from

December 7, 2011, to January 15, 2012, of more than $30,000 were not consistent with their profiles and previous transfer activities with JamUSA;

16.     On June 14, 2012, Victim 2 (V2) appeared at the Charleston County Sheriff's office in Charleston Heights, South Carolina.  V2 is 92 years old and is a resident of Charleston, South Carolina.  V2 received a telephone call from an unknown caller (UC3) claiming to be with American Cash Awards.  UC3 told V2 that his name was Newton Bennett and that V2 had won a contest and would be receiving a payout of $3,500,000.  V2 was told that before V2 could receive the payout, V2 needed to pay American Cash Awards $80,000 for fees and taxes and that V2 would receive the payout on June 14, 2012.  UC3 gave V2 the telephone number of American Cash Awards' bank. V2 called the telephone number and spoke with an unknown individual who identified herself as "Pamela."  At the direction of UC3, V2 went to his bank to gather the requested funds and on May 25, 2012, V2 mailed a cashier's check in the amount of $80,000 to SHANNON O'CONNOR in Deerfield Beach, Florida.  The cashier's check was drawn from V2's account at Bank of America (BOA).  On June 13, 2012, a BOA employee contacted V2 and V2 informed the BOA employee of the large payment he expected from American Cash Awards.  The BOA employee informed V2 that he had been a victim of a fraud and to contact the local authorities;

17.     BOA was able to determine that the cashier's check that V2 sent O'CONNOR had been deposited at JP Morgan Chase Bank (JP Morgan).  JP Morgan informed law enforcement that the cashier's check payable to O'CONNOR was the result

8

of a fraud.  JP Morgan immediately determined that the check had been deposited into a

JP Morgan account of O'CONNOR and her mother;

18.    Western Union records reveal that on September 26, 2011, and

September 30, 2011, O'CONNOR received two wire transfers totaling $9,000 from RB of

Berlin Heights, Ohio.  In addition, O'CONNOR received two additional wire transfers

from RB on October 17, 2011, and October 28, 2011, that totaled $1,328.  O'CONNOR

received three wire transfers sent October 5, 2011; October 6, 2011; and October 10,

2011, totaling $3,020 from ML of Leighton, Alabama.  On October 12, 2011,

O'CONNOR received a wire transfer of $1,000 from SZ of Rapid City, Michigan.

Western Union records show that O'CONNOR wired $12,000 in five (5) transactions to

three individuals in Jamaica between April 30, 2012, and May 14, 2012.  Between

August 23, 2011, and September 19, 2011, O'CONNOR conducted five (5) transactions,

wiring $10,700 to three (3) individuals in Jamaica;

19.    One of the unknown callers called V2 and instructed V2 to mail $25,000 to

V1.  V1 received a $25,000 cashier's check from V2 on about September 6, 2012.  One of

the unknown callers contacted V1 and instructed V1 to deposit the check and send a

$25,000 money order to O'CONNOR at P.O. Box 880596, Boca Raton, Florida 33488.

20.    In 2009 and 2010, KAZRAE GRAY worked with LAVRICK WILLOCKS.

O'CONNOR met KAZRAE GRAY on several visits to Jamaica.  Western Union records

show that KAZRAE GRAY received wire transfers directly from CW of Texas, a known

victim of the scheme.  KAZRAE GRAY also received money from several other

9

suspected victims.  KAZRAE GRAY had victims send money to LC, who would forward the money to Jamaica under KAZRAE GRAY's direction.  LC wire transferred money to WILLOCKS in Jamaica on numerous occasions between September 2009 and March 2010.

21.    KIMBERLY CAROL-JEAN HUDSON is the girlfriend of LAVRICK WILLOCKS.  In a written statement to the Jamaica Constabulary Force on November 16, 2012, HUDSON stated that in 2011 WILLOCKS' father made deposits into her account at Jamaican National totaling approximately $35,000.  HUDSON stated she gave WILLOCKS her account number at Jamaican National.  HUDSON stated that WILLOCKS gave the account number to his father, who deposited the money in HUDSON's account for WILLOCKS;

22.    Jamaican National records show that HUDSON received a $6,700 wire from SHANNON O'CONNOR on October 10, 2011, and a $9,850 wire on December 2, 2011.  MIKAEL OMARR GILLETTE directed a $600 wire on December 7, 2011, and DT directed a $7,500 wire on January 13, 2012.  O'CONNOR stated the money wired was receipts from fraud victims.  The wires by DT and GILLETTE occurred after JamUSA cut O'CONNOR off from wire services.  GILLETTE stated he received money from victims at WILLOCKS' or MARIO HINES' request.  GILLETTE recruited DT to transfer money for him at JamUSA;

23.    Moneygram records show that O'CONNOR sent HUDSON three (3) money wire transfers: April 4, 2012, for $885; May 4, 2012, for $500; and June 8, 2012,

10

for $500.  Western Union records show that HUDSON received $1,875 from an identified victim, TY, of Portage, Ohio, on July 12, 2011;

24.     In November of 2011, WILLOCKS instructed O'CONNOR to meet HUDSON at HUDSON's relative's house in Fort Lauderdale, Florida, to pick up money. O'CONNOR met HUDSON outside the relative's house and HUDSON handed O'CONNOR $10,000 in cash.  O'CONNOR wired the money to WILLOCKS in Jamaica.  HUDSON had initially traveled from Jamaica to New York, before traveling to Florida.  The money was proceeds of the fraud scheme;

25.     In July 2012, O'CONNOR observed a number of people, including HUDSON, at WILLOCKS' house in Jamaica.  HUDSON was at times on the telephone as were others at the house.  HUDSON and others at the house were making telephone calls to victims of the fraud;

26.     The Jamaican Constabulary Force conducted a search of WILLOCKS' house in August of 2012.  HUDSON'S iPad was seized and found to contain magicJack voice mails from known victims of the scam.  HUDSON was physically present at WILLOCKS' residence when law enforcement searched the residence in both August and November of 2012.  WILLOCKS; HINES; DARIEL PALMER, a/k/a INNOCENT PALMER; BILLINGS; and others made many fraudulent telephone calls from the same residence;

27.     XANU ANN MORGAN learned of the scam in about May of 2011.  AKIL GRAY directed MORGAN to pick up wired proceeds of the scam through JamUSA in

October of 2011.  MORGAN received the money and deposited it into her Jamaican National bank account.  AKIL GRAY used MORGAN's ATM card to withdraw the money from MORGAN's account.  MORGAN also collected scam proceeds for AKIL GRAY through Western Union;

28.     AKIL GRAY asked MORGAN to make scam phone calls.  MORGAN attempted to make two scam phone calls but was unsuccessful.  MORGAN received five (5) wire transfers of victim funds from O'CONNOR between October 26, 2011, and December 16, 2011.  The wire transfers were made from the United States to Jamaica and totaled $32,250.  WILLOCKS instructed O'CONNOR to wire the funds to MORGAN. On May 8, 2012, O'CONNOR used Moneygram to wire transfer $500 from Florida to MORGAN in Jamaica; GILLETTE wired $2,000 from Florida to MORGAN on October 20, 2011; and AKIL GRAY wired $2,000 from Florida to MORGAN on October 22, 2011;

29.     JASON JOSEPH JAHALAL traveled from Jamaica to Florida to receive proceeds of the scam in October of 2011.  JAHALAL and AKIL GRAY received $30,000 of fraud proceeds from O'CONNOR and carried the money back to Jamaica.  In a telephone call between WILLOCKS, who at the time was in Florida, and JAHALAL, who was in Jamaica, WILLOCKS instructed JAHALAL how to use his Blackberry smart phone to find money transfer instructions.  WILLOCKS instructed JAHALAL to pick up wired fraud proceeds in Jamaica;

12

30.     Victim DE used Moneygram to wire transfer $2,500 from the United States to JAHALAL in Jamaica in August of 2012.  O'CONNOR used Moneygram to wire transfer $2,500 from the United States to JAHALAL in Jamaica in May of 2012;

31.      WILLOCKS instructed O'CONNOR to wire transfer scam proceeds from Florida to DAHLIA ELAINE HUNTER in Jamaica.  HUNTER received the wired money from O'CONNOR.  HUNTER also received money SHERLET ANETTA LOVE wired from New York to Jamaica.  HUNTER is WILLOCKS' mother and lives in the same house as WILLOCKS.  The fraudulent telemarketing scheme is openly operated within the house;

32.     In January and February of 2012, HUNTER enlisted the help of her friend AN to receive approximately $30,000 in proceeds of the scam.  HUNTER had money orders made payable to AN.  The money orders were sent to AN in five (5) packages within a six-day period.  HUNTER directed AN to deposit the money orders into his bank account.  Per HUNTER's direction, once the money orders cleared AN's bank account, AN withdrew cash from his bank account and gave it to LOVE;

33.     Jamaican officials seized $14,000 in United States currency from WILLOCKS in September of 2012.  HUNTER told O'CONNOR during a telephone call that they would have WILLOCKS' father claim the money was his, in order to recover the money from authorities.  HUNTER knew the money was proceeds of the scam.  On about November 16, 2012, law enforcement authorities seized HUNTER's telephone and

13

discovered text messages between O'CONNOR and HUNTER.  The text messages discussed known victims of the scheme;

34.    LOVE participated in the fraud conspiracy since at least 2009.  LOVE made fraudulent telephone calls from Jamaica to victims in the United States as part of the scam.  LOVE traveled from Jamaica to Florida to receive scam proceeds from O'CONNOR in about September 2012.  LOVE engaged in a series of text message and telephone conversations with O'CONNOR after LOVE arrived in the United States. They discussed money LOVE was expected to receive from O'CONNOR and transport to WILLOCKS in Jamaica.  O'CONNOR claimed to have $55,000 available for LOVE; LOVE was expecting to carry only $25,000 back to Jamaica; LOVE contacted HUNTER via text message for instructions on what she should do with the money, which she knew was proceeds of the scam; and

35.    While LOVE was in the United States, O'CONNOR purchased some clothing and other items for some members of the conspiracy, per WILLOCKS' request. WILLOCKS instructed O'CONNOR to give these items and $14,000 in United States currency to LOVE, while LOVE was in the United States.  O'CONNOR met LOVE at LOVE's cousin's residence in Florida.  O'CONNOR handed LOVE the items along with an envelope containing the money.  LOVE asked O'CONNOR how much was in the envelope.  O'CONNOR informed LOVE that it contained $14,000.  LOVE knew the money was proceeds of the scam. LOVE transported the money to WILLOCKS in Jamaica.

14

36.     Victim 3 (V3) is a resident of a small town in South Dakota.  V3 began to receive telephone calls in summer of 2012.  The callers claimed to be with American Cash Awards (ACA).  One of the callers used the name Newton Bennett.  The callers informed V3 that he and his wife had won a $3.5 million award along with a bonus prize of a 2012 Mercedes.  Bennett and the other callers told V3 that before they could collect their prize they had to pay some associated taxes and fees.  V3 and his wife were told to send $14,000 to the IRS office in Florida to pay the taxes and fees.  V3 sent a cashier's check in the amount of $14,000 by U.S. Mail, as instructed by the callers.  V3 sent the check to the address provided by the callers.  The cashier's check was dated July 31, 2012, and made payable to SHANNON O'CONNOR.  On August 1, 2012, the cashier's check was deposited into O'CONNOR's bank account at SunTrust Bank.  V3 was later instructed by callers from ACA to mail $5,000 in cash to V1.  V3 told the callers that V3 did not want to send cash through the mail.  V3 sent play money to V1 instead of cash. Days later, V3 received a telephone call from an individual who identified himself as being from the FBI.  The caller informed V3 that sending counterfeit money was a crime.  The caller told V3 if V3 did not send real cash V3 would be arrested.

COUNT ONE

**Conspiracy**

The Grand Jury Charges:

Allegations contained in paragraphs 1 through 36 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

From an unknown time beginning before in or about January 2009, and continuing through the present time, in the Districts of North Dakota, South Dakota, New York, New Hampshire, South Carolina, California, Florida, Jamaica, and elsewhere,

LAVRICK WILLOCKS;
MARIO HINES;
GREGORY GOODEN;
GARETH BILLINGS;
AKIL GRAY;
DARIEL PALMER, a/k/a INNOCENT PALMER;
MIKAEL OMARR GILLETTE;
SHANNON O'CONNOR;
CHRISTINA RENEE HOGARTH;
KIMBERLY CAROL-JEAN HUDSON;
XANU ANN MORGAN;
SHERLET ANETTA LOVE;
JASON JOSEPH JAHALAL;
KAZRAE GRAY; and
DAHLIA ELAINE HUNTER;

in connection with the conduct of telemarketing, did knowingly and willfully combine, conspire, confederate, and agree with each other and others, known and unknown to the grand jury, for the purpose of executing the aforesaid scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, knowing the pretenses, representations and promises were false and fraudulent when made,

    (a)    to commit wire fraud, that is, to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing a scheme and artifice that affects a financial institution, in violation of Title 18, United States Code, Section 1343; and

    (b)    to commit mail fraud, that is, to place and cause to be placed in a post office and authorized depository for mail matter, money to be sent and delivered by the Postal Service; and did deposit and cause to be deposited, money to be delivered by private and commercial interstate carriers; and took and received money therefrom, and knowingly caused it to be delivered by mail and by such carrier according to the direction thereon, at places which it was directed to be delivered by the person to whom it was addressed, affecting a financial institution, in violation of Title 18, United States Code, Section 1341.

<u>OBJECT OF CONSPIRACY</u>

37.    The object of the conspiracy was for defendants and co-conspirators to fraudulently enrich themselves by falsely informing more than ten (10) victims over the age of 55 that the victims had won large cash awards of money, inducing the victims to pay fees in advance of receiving their purported cash awards and then keeping victims'

money for the defendants' and their co-conspirators' own benefit, without paying any cash award winnings to any victim.

<u>MANNER AND MEANS OF CONSPIRACY</u>

The manner and means by which defendants and their co-conspirators sought to accomplish the object of the conspiracy include the following:

38.     Defendants LAVRICK WILLOCKS; MARIO HINES; GREGORY GOODEN; GARETH BILLINGS; AKIL GRAY; DARIEL PALMER, a/k/a INNOCENT PALMER; residents of the Country of Jamaica, and their co-conspirators contacted and caused to be contacted, elderly persons in the United States who were falsely informed they had won millions of dollars.  Defendants WILLOCKS, HINES, GOODEN, BILLINGS, AKIL GRAY, and PALMER persuaded and caused elderly victims to be persuaded that they needed to pay bogus fees of hundreds to thousands of dollars in order to collect their purported winnings;

39.     Defendants and their co-conspirators, referred to victims as "clients" and purchased lists of prospective clients and client contact information from co-conspirators and others who obtained, compiled, and sold such lists in the United States;

40.     Defendants and their co-conspirators sent and caused to be sent communications to elderly victims in the United States that purported to be from a genuine sweepstakes company, from financial institutions such as banks, and from federal agencies, including the FBI.  Communications discussed victims' purported cash

awards and winnings and were designed to hide the true nature of the conspiracy and to convince victims of the authenticity of purported winnings and fees;

41.     Defendants and their co-conspirators contacted and caused to be contacted elderly victims who were instructed to send bogus fees in order to secure winnings. Victims were instructed how and to whom bogus fees were to be sent.  Defendants and their co-conspirators instructed victims and others to wire transfer, mail, and deliver money withdrawn from federally insured and licensed financial institutions such as banks to O'CONNOR, HOGARTH, and other "middlemen" in Florida and elsewhere. Middlemen in turn received, deposited and wire transferred money via federally insured and licensed financial institutions such as banks and others, to the defendants and their co-conspirators in Jamaica, and to providers of client lists in the United States and elsewhere and were instructed to keep a portion of the fees for themselves.  Other times middlemen were instructed to purchase goods in the United States and ship the goods commercially to defendants and their co-conspirators in Jamaica; or, co-conspirators and victims were instructed to send money obtained as bogus fees through the U.S. Mail and private and commercial couriers to other persons for delivery to defendants and their co-conspirators in Jamaica, and elsewhere;

42.     Defendants and their co-conspirators used aliases such as "Newton Bennett," "Victoria O'Connor," "Pamela," and variations of names and other aliases to communicate with victims and to receive and transfer victims' money in North Dakota, South Carolina, Florida, and elsewhere;

19

43.     Defendant WILLOCKS recruited O'CONNOR, HOGARTH, and other middlemen to receive victims' money in Florida; to transfer money as payment for providers of "client lists;" to purchase goods with victim money and ship the goods to WILLOCKS and his co-conspirators; to transfer money to WILLOCKS and his co-conspirators using Western Union, Moneygram, JamUSA, and other means, and to keep a portion of the victims' money for their own benefit;

44.     Defendants and their co-conspirators received wire transfers of victims' money via federally insured and licensed financial institutions such as banks, and via foreign money transfer services such as JamUSA, and received victims' money and goods purchased with victims' money, in Jamaica.  Other times, defendants and their co-conspirators traveled to Florida and directed others to travel to Florida to receive victims' money from middlemen and to purchase goods with victims' money and instruct middlemen to ship the purchased goods to Jamaica via commercial carrier and otherwise;

45.     Defendants and their co-conspirators traveled from Jamaica to Florida to receive victims' money and returned with the money to Jamaica;

46.     Defendants and their co-conspirators contacted and caused elderly victims to be contacted numerous times with requests for bogus fees.  Defendants and their co-conspirators falsely told victims that their winnings depended upon receipt of the bogus fees; other times they told victims that their winnings were delayed due to administrative difficulty.  The process continued for as long as the victims could be persuaded to send additional money;

20

47.     Defendants and their co-conspirators used different methods designed to make their scheme appear legitimate to victims.  They claimed at times to be bankers and FBI agents and they used Voice Over Internet Protocol (VOIP) as well as "magicJack" technology to make communications by telephone appear as if calls originated in the United States even when the calls originated in Jamaica; and

48.     Defendants and their co-conspirators victimized at least 10 persons over the age of 55;

All in violation of Title 18, United States Code, Sections 1349 and 2326.

## COUNTS TWO through TWENTY-THREE

**Wire Fraud**

The Grand Jury Further Charges:

From an unknown time beginning before in or about January 2009, and continuing through the present time, in the Districts of North Dakota, South Dakota, New York, New Hampshire, South Carolina, California, Florida, Jamaica, and elsewhere,

LAVRICK WILLOCKS;
MARIO HINES;
GREGORY GOODEN;
GARETH BILLINGS;
AKIL GRAY;
DARIEL PALMER, a/k/a INNOCENT PALMER;
MIKAEL OMARR GILLETTE;
SHANNON O'CONNOR;
CHRISTINA RENEE HOGARTH,
KIMBERLY CAROL-JEAN HUDSON;
XANU ANN MORGAN;
SHERLET ANETTA LOVE;
JASON JOSEPH JAHALAL;
KAZRAE GRAY; and
DAHLIA ELAINE HUNTER;

in connection with the conduct of telemarketing that affects a financial institution, did knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and did transmit and cause to be transmitted, by means

of wire communications in interstate and foreign commerce, certain writings, signs,

signals, pictures, and sounds.

## PURPOSE OF THE SCHEME AND ARTIFICE

The purpose of the scheme and artifice was as follows:

49.     Defendants and other participants in the scheme would fraudulently enrich

themselves by falsely informing elderly victims that the victims had won a large amount

of money, inducing victims to pay fees in advance of victims receiving purported

winnings, and keeping the victims' money for the defendants' and other participants' own

benefit without paying winnings.

50.     Paragraphs 1 through 48 of this Superseding Indictment are realleged and

incorporated by reference as though fully set forth herein as a description of the scheme

and artifice.

## USE OF WIRES

51.     On or about the date specified below and in paragraphs incorporated by

reference herein, in the District of North Dakota, and elsewhere, defendants, for the

purpose of executing the aforesaid scheme and artifice, did knowingly cause to be

transmitted, by means of wire communications in interstate and foreign commerce,

certain writings, signs, signals, pictures, and sounds, as more particularly described

below:

23

| Count | Date Sent | Sender | Amt (US) | Receiver |
|---|---|---|---|---|
| 2 | October 2, 2009 | LC | $1,568.00 | Lavrick Willocks |
| 3 | January 12, 2010 | LC | $3,500.00 | Lavrick Willocks |
| 4 | March 26, 2010 | LC | $2,250.00 | Lavrick Willocks |
| 5 | June 14, 2011 | Shannon O'Connor | $3,900.00 | Lavrick Willocks |
| 6 | September 14, 2011 | Victim1 (V1) | $3,500.00 | unknown, fbo American Cash Awards |
| 7 | September 19, 2011 | Shannon O'Connor | $6,850.00 | Gregory Gooden |
| 8 | September 26, 2011 | Victim RB | $6,500.00 | Shannon O'Connor |
| 9 | September 30, 2011 | Victim RB | $2,500.00 | Shannon O'Connor |
| 10 | October 17, 2011 | Victim RB | $560.00 | Shannon O'Connor |
| 11 | October 18, 2011 | Shannon O'Connor | $7,500.00 | Gregory Gooden |
| 12 | December 2, 2011 | Shannon O'Connor | $9,850.00 | Kimberly Hudson |
| 13 | December 7, 2011 | Mikael Omarr Gillette | $600.00 | Kimberly Hudson |
| 14 | December 7, 2011 | Shannon O'Connor | $4,900.00 | Gareth Billings |
| 15 | December 13, 2011 | Mikael Omarr Gillette | $450.00 | Gregory Gooden |
| 16 | December 16, 2011 | Shannon O'Connor | $7,350.00 | Xanu Ann Morgan |
| 17 | December 23, 2011 | Mikael Omarr Gillette | $2,350.00 | Akil Gray |
| 18 | January 5, 2012 | Mikael Omarr Gillette | $3,200.00 | Gareth Billings |
| 19 | March 1, 2012 | Mikael Omarr Gillette | $735.00 | Mario Hines |
| 20 | March 16, 2012 | Mikael Omarr Gillette | $300.00 | TF |
| 21 | April 21, 2012 | GG | $1,200.00 | Dariel Palmer |
| 22 | April 30, 2012 | Shannon O'Connor | $2,350.00 | Dahlia Hunter |
| 23 | May 2, 2012 | Shannon O'Connor | $2,500.00 | Jason Jahalal |

In violation of Title 18, United States Code, Sections 1343, 2326, and 2.

COUNTS TWENTY-FOUR through THIRTY

**Mail and Other Fraud**

The Grand Jury Further Charges:

From an unknown time beginning before in or about January 2009, and continuing

through the present time, in the Districts of North Dakota, South Dakota, New York, New

Hampshire, South Carolina, California, Florida, Jamaica, and elsewhere,

LAVRICK WILLOCKS;
MARIO HINES;
GREGORY GOODEN;
GARETH BILLINGS;
AKIL GRAY;
DARIEL PALMER, a/k/a INNOCENT PALMER;
MIKAEL OMARR GILLETTE;
SHANNON O'CONNOR;
CHRISTINA RENEE HOGARTH,
KIMBERLY CAROL-JEAN HUDSON;
XANU ANN MORGAN;
SHERLET ANETTA LOVE;
JASON JOSEPH JAHALAL;
KAZRAE GRAY; and
DAHLIA ELAINE HUNTER;

in connection with the conduct of telemarketing that affects a financial institution, did

knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to

defraud, and to obtain money by means of materially false and fraudulent pretenses,

representations, and promises, knowing the pretenses, representations, and promises were

false and fraudulent when made; and did, for the purpose of executing such scheme and

artifice and attempting so to do, place and cause to be placed in a Post Office and

25

authorized depository for mail matter, money orders, checks, and money to be sent and delivered by the Postal Service; and did deposit and cause to be deposited, money to be delivered by private and commercial interstate carriers; and did take and receive money therefrom; and knowingly caused it to be delivered by mail and by such carrier according to the direction thereon, at places which it was directed to be delivered by the person to whom it was addressed.

## PURPOSE OF THE SCHEME AND ARTIFICE

The purpose of the scheme and artifice was as follows:

52.     Paragraphs 1 through 51 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

53.     Defendants and other co-conspirators in the scheme would fraudulently enrich themselves by falsely informing elderly victims that the victims had won a large amount of money, inducing victims to pay fees in advance of victims receiving purported winnings, and keeping the victims' money for the defendants' and other participants' own benefit.

## USE OF MAIL, PRIVATE AND COMMERCIAL CARRIER

54.     On or about dates specified as to each Count below and in paragraphs incorporated by reference, in the District of North Dakota, and elsewhere, defendants, for the purpose of executing the aforesaid scheme and artifice did knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain

26

money by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations and promises were false and fraudulent when made; and did for the purpose of executing such scheme and artifice and attempting so to do, place and cause to be placed in a post office and authorized depository for mail matter, money to be sent and delivered by the Postal Service; and did deposit and cause to be deposited, money to be delivered by private and commercial interstate carriers; and took and received money therefrom, and knowingly caused it to be delivered by mail and by such carrier according to the direction thereon, at places which it was directed to be delivered by the person to whom it was addressed:

| Count | Date Sent | Sender | Amts (US) | Receiver |
|---|---|---|---|---|
| 24 | October 3, 2011 | Victim 1 | $20,000 $20,000 $25,000 | Shannon O'Connor, fbo ACA |
| 25 | October 11, 2011 | Victim 1 | $9,500 | Shannon O'Connor, fbo American Cash Awards (ACA) |
| 26 | October 26, 2011 | Victim 1 | $25,000 | Shannon O'Connor, fbo ACA |
| 27 | November 14, 2011 | Victim 1 | $57,000 | Shannon O'Connor, fbo ACA |
| 28 | May 25, 2012 | Victim 2 | $80,000 | Shannon O'Connor, fbo ACA |
| 29 | July 31, 2012 | Victim 3 | $14,000 | Shannon O'Connor |
| 30 | September 6, 2012 | Victim 2 | $25,000 | Victim 1, fbo ACA |

All in violation of Title 18, United States Code, Sections 1341, 2326, and 2.

27

COUNT THIRTY-ONE

**Money Laundering Conspiracy**

The Grand Jury Further Charges:

THE CONSPIRACY

General Allegations in paragraphs 1 through 54 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein;

From on or about an unknown time beginning in or about January 2009 through the present time, in the Districts of North Dakota, South Dakota, New York, New Hampshire, South Carolina, California, Florida, Jamaica, and elsewhere, the defendants:

LAVRICK WILLOCKS;
MARIO HINES;
GREGORY GOODEN;
GARETH BILLINGS;
AKIL GRAY;
DARIEL PALMER, a/k/a INNOCENT PALMER;
KIMBERLY CAROL-JEAN HUDSON;
XANU ANN MORGAN;
SHERLET ANETTA LOVE;
JASON JOSEPH JAHALAL;
KAZRAE GRAY; and
DAHLIA ELAINE HUNTER;

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956(h), to wit:

(a)  to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

28

(b)  to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, wire fraud, mail fraud and conspiracy to commit wire and mail fraud, from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(c)  to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, wire fraud, mail fraud and conspiracy to commit wire and mail fraud, from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to avoid a transaction reporting requirement under Federal law, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(ii);

## MANNER AND MEANS

The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

1.      Defendants WILLOCKS, HINES, GOODEN, BILLINGS, AKIL GRAY and PALMER, residents of the Country of Jamaica, and their co-conspirators contacted and caused to be contacted elderly persons in the United States who were falsely informed they had won millions of dollars.  Defendants persuaded and caused elderly victims to be persuaded that they needed to pay bogus fees of hundreds to thousands of dollars in order to collect their purported winnings;

2.      Defendants and their co-conspirators referred to victims as "clients." Defendants and their co-conspirators purchased lists of prospective clients and client contact information from co-conspirators and others who obtained, compiled and sold such lists in the United States;

3.      Defendants and their co-conspirators sent and caused to be sent communications to elderly victims in the United States that purported to be from a genuine sweepstakes company, from financial institutions such as banks and from federal agencies, including the FBI.  Communications discussed victims' purported cash awards and winnings and were designed to hide the true nature of the conspiracy and convince victims of the authenticity of purported winnings and fees;

4.      Defendants and their co-conspirators contacted and caused to be contacted elderly victims who were instructed to send bogus fees in order to secure winnings. Victims were instructed how and to whom bogus fees were to be sent.  Defendants and their co-conspirators instructed victims and others to wire transfer, mail and deliver money to O'CONNOR, HOGARTH and other "middlemen" in Florida and elsewhere. Middlemen in turn wire transferred money to defendants and their co-conspirators in

Jamaica and to providers of client lists in the United States and elsewhere.  Middlemen were instructed to keep a portion of the fees for themselves.  Other times, middlemen were instructed to purchase goods in the United States and ship goods to defendants and their co-conspirators in Jamaica.  Other times, co-conspirators and victims were instructed to send money obtained as bogus fees through the U.S. Mail and private couriers to other persons for delivery to defendants and their co-conspirators in Jamaica and elsewhere;

     5.     Defendants and their co-conspirators used the alias "Newton Bennett," "Victoria O'Connor," "Pamela" and variations of names and other alias' to communicate with victims and to receive and transfer victims' money in North Dakota, Florida and elsewhere;

     6.     Defendant WILLOCKS recruited O'CONNOR, HOGARTH and other middlemen to receive victims' money in Florida; to transfer money as payment for providers of "client lists;" to purchase goods with victim money and ship goods to WILLOCKS and his co-conspirators; to transfer money to WILLOCKS and his co-conspirators, using Western Union, Moneygram, JamUSA and other means, and to keep a portion of the victims' money for their own benefit;

     7.     Defendants and their co-conspirators received wire transfers of victims' money and received victims' money and goods purchased with victims' money, in Jamaica.  Other times, defendants and their co-conspirators traveled to Florida and directed others to travel to Florida to receive victims' money from middlemen, to

purchase goods with victims' money and to instruct middlemen to ship purchased goods to Jamaica;

8.      Defendants and their co-conspirators traveled from Jamaica to the United States to receive victims' money and returned with the money to Jamaica;

9.      Defendants and their co-conspirators contacted and caused elderly victims to be contacted numerous times with requests for bogus fees.  Defendants and their co-conspirators falsely told victims their winnings depended upon receipt of the bogus fees; other times they told victims their winnings were delayed due to administrative difficulty.  The process continued for as long as victims could be persuaded to send additional money;

10.     Defendants and their co-conspirators used different methods designed to make their scheme appear legitimate to victims.  They claimed at times to be bankers and FBI agents; they used Voice Over Internet Protocol (VOIP) and "magicJack" technology to make communications by telephone appear as if calls originated in the United States even when the calls originated in Jamaica; and

11.     Defendants and their co-conspirators victimized at least 10 persons over the age of 55;

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION

The Grand Jury Further Finds Probable Cause That:

Allegations in Counts One through Thirty-One of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein, for the purpose of forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(8), and 982(b)(1), and Title 28, United States Code, Section 2461(c).

Upon conviction of any of the offenses alleged in Counts One through Thirty-One of this Indictment, defendants shall forfeit to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(8), and 982(b)(1), any property, real or personal, constituting, derived from, or traceable to the gross proceeds that the defendants obtained, directly or indirectly, as a result of the violations of Title 18, United States Code, Sections 1341, 1343, 1349, 1956, and 2326, and any property, real or personal, that was used or intended to be used to commit, to facilitate, or to promote the commission of such offense.  All pursuant to Title 18, United States Code, Sections 981(a)(1)(C),  982(a)(1), 982(a)(8), and 982(b)(1), and Title 28, United States Code, Section 2461(c), and the procedures of Title 21, United States Code, Section 853.

A TRUE BILL:


/s/ Grand Jury Foreperson
Foreperson


/s/ Timothy Q. Purdon
TIMOTHY Q. PURDON
United States Attorney

CRH:lal:rab

33